## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

STEPHEN BODNAR, et al.,            :
                                   :
            Plaintiffs,            :
                                   :   3:12-CV-01337
      v.                           :   (JUDGE MARIANI)
                                   :
NATIONWIDE MUTUAL INSURANCE        :
CO. and AMCO INSURANCE CO.,        :
                                   :
            Defendants.            :

## MEMORANDUM OPINION

### I.   Introduction

Presently before the Court are two Motions for Summary Judgment (Docs. 114; 160)

filed by the Defendant in the above-captioned action. For the reasons that follow, the Court

will grant the Motions.

### II.   Statement of Facts

#### a. Underlying Accident and Lawsuits

During oral argument, counsel for moving Defendant Nationwide Insurance

Company[1] stated:

> Regarding the issues of fact, I think, if you look at the facts, we all agree on
> what the facts are. We disagree on what they mean. I'm not getting up here
> saying a witness didn't say this, he's not getting up here saying a document
> doesn't say that.

---

[1] There is only one Defendant in this case, variously called AMCO or Nationwide. For purposes of expediency only, the Court refers to the Defendant in this Opinion as "Nationwide."

> There's no issue on that, we agree on the facts, we disagree on what
> they mean . . . .

(Oral Argument Tr., Feb. 18, 2015, Doc. 182, at 65:8-14.) The Court agrees with this

assessment. The statements of fact accompanying the two motions for summary judgment

are voluminous and contain extensive denials. However, a review of the bases for each

denial indicates that Plaintiffs object primarily to the interpretation that Defendant places on

certain facts, or that Plaintiffs believe that other facts of record are more important or

otherwise undercut reliance on the facts that Defendant highlights. Both sides appear to

agree on what actually happened during the period of time that gave rise to this cause of

action, as memorialized most clearly in Nationwide's claims file. Thus, all of the facts

recounted below are undisputed. There are no disputed facts aside from these, but only

disputed interpretations of these facts.

The instant action arose from an accident that occurred on April 29, 2010. At that

time, Stephen Bodnar was the owner of a masonry business developing land in Luzerne

County, Pennsylvania for the purposes of opening a campground there, to be called

Bodnarosa Campground. (Am. Compl., Doc. 17, at ¶ 8.)[2] In April of 2010, Bodnar agreed to

pay his acquaintance James Berry to do certain excavation work at Bodnarosa, during a

time that Berry needed work for a few weeks between jobs. (Id. at ¶¶ 9-11.) Berry agreed to

help Bodnar with, among other things, digging trenches for sewer lines at the proposed

---

[2] For purposes of this Opinion, the Court only cites allegations or facts which the opposing party
has admitted.

campsite. (See id. at ¶¶ 12-13.) On April 29, both Bodnar and Berry were digging inside a trench when the sides of the trench collapsed inward on top of them. (Id. at ¶ 18.) Bodnar was injured in the collapse, but survived. Berry was rescued from the trench, but was pronounced dead from his injuries by the time he was taken to a hospital. (See, e.g., All Activity Logs, Doc. 173-4, at 51.)

At the time of the accident, Bodnar "was insured pursuant to the terms and conditions of a Commercial General Liability insurance policy issued by AMCO INSURANCE COMPANY" with a limit of $1,000,000.00 for each occurrence. (Def.'s Concise Statement of Mat. Facts, Doc. 161, at ¶¶ 2, 4.) Following the accident, the decedent's widow, "Danielle Berry, individually and as Administratrix of the Estate of James Berry, brought suit against Plaintiff and Bondnarosa [sic] Campground, LLC in the Court of Common Pleas of Luzerne County . . . ." (Id. at ¶ 5.) Bodnar filed a claim with the Defendant Nationwide/AMCO insurance company for indemnification in this tort action. (See generally Doc. 173-4 at 61-65.) Nationwide hired and appointed a lawyer to defend Bodnar in the underlying lawsuit, and thereafter continuously provided him with a defense in that lawsuit, even while it challenged its obligation to do so in the declaratory judgment action discussed below. (See Doc. 161 at ¶¶ 9-10.)

During the pendency of the tort claim, Nationwide investigated Bodnar's claim to determine whether it owed him coverage. To aid in this effort, Nationwide filed a declaratory judgment action, first in this District (which was dismissed under the Declaratory Judgment

3

Act for only presenting questions of state law), (*see AMCO Ins. Co. v. Berry*, 3:11-CV-989, Doc. 7), and then in the Luzerne County Court of Common Pleas. The declaratory judgment action sought a declaration that Danielle Berry's tort claims are not covered by the Nationwide/AMCO policy and that Nationwide had no duty to indemnify Bodnar or provide him with a legal defense in that underlying lawsuit. (*See* Luzerne Cnty. Compl. for Decl. Relief, Doc. 161-7, at 6).) The need for a declaratory judgment purportedly arose due to a dispute under the terms of the policy as to whether James Berry actually qualified as an "employee" or a "temporary worker" of Bodnar and Bodnarosa. If he were found to be an employee, then the policy excluded coverage, whereas if he were found to be a temporary worker, then coverage would attach. (*See* p. 6, *infra*.)

On August 2, 2012, Bodnar and Danielle Berry entered into an agreement to settle the underlying tort claim, wherein Bodnar agreed to pay Berry the $1,000,000.00 limit of his AMCO policy, together with accrued interest, and to transfer his interests in the policy to her. (*See* Settlement Agreement, Doc. 161-5, at 1.) In return, Berry agreed

> to indemnify Bodnar, his agents, employees, subsidiaries, and affiliates and save them harmless from any and all further liability, loss, damage, claims, or expenses arising because of the death of James Dean Berry as well as any and all liability, loss, damage, or claims arising because of Bodnar's signing of this Agreement, and, if necessary, in order to save Bodnar so harmless to satisfy on his behalf, any judgment arising against him in any way.

(*Id*. at 2.)

Slightly before they signed the settlement agreement, Bodnar and Berry, jointly filed the instant action against AMCO/Nationwide before the undersigned. This action alleges

4

that AMCO/Nationwide handled Bodnar's claim for indemnification in bad faith and in breach of its contractual duty of good faith and fair dealing, which caused Bodnar various damages.

During the early stages of our federal bad-faith action, i.e., on February 13, 2013, the Luzerne County declaratory judgment action was "discontinued." (*See* Statement of Proposed Undisputed Material Facts for Second Mot. for Summ. J., Doc. 115, at ¶ 7.) "Defendant AMCO/Nationwide paid Danielle Berry, individually and as Administratrix of the Estate of James Berry, the Policy's limits of $1,000,000.00, plus interest, in accordance with the terms and conditions set forth in the [Bodnar-Berry] Agreement." (*Id.* at ¶ 9.)

### b. Nationwide's Claims Handling

In determining whether evidence of record exists to create a dispute of fact about Nationwide's bad faith, the Court looks to the information contained in Nationwide's Bodnar claim file. The following information about the claim file—most of which was submitted by the nonmoving Plaintiff—is undisputed.

Bodnar's insurance policy stated in pertinent part: [3]

We [i.e., Nationwide] will pay those sums that the insured becomes legally obligated to pay as damages, because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.

---

[3] Plaintiffs admit that the following are accurate statements of the policy language. (*See* Pls.' Answ. to Def.'s Statement of Mat. Facts in Supp. of Third Mot. for Summ. J., Doc. 173, at ¶¶ 7-8.)

(Commercial General Coverage Form, Doc. 161-4, § I(1)(a).) The exclusion that Nationwide

found relevant, titled "Employer's Liability," excludes coverage for:

> "Bodily injury" to:
>       (1) An "employee" of the insured arising out of and in the course of:
>          (a) Employment by the insured; or
>          (b) Performing duties related to the conduct of the insured's business; or
>       (2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

(Id. at § I(2)(e).) In the section entitled "Definitions," the policy further states that

"'[e]mployee' includes 'leased worker.' 'Employee' does not include a 'temporary worker.'"

(Id. at § V(5).) It then defines "leased worker" as "a person leased to you by a labor leasing

firm under an agreement between you and the labor leasing firm, to perform duties related

to the conduct of your business. 'Leased worker' does not include 'temporary worker.'" (Id.

at § V(10).) Finally, "'[t]emporary worker' means a person who is furnished to you to

substitute for a permanent 'employee' on leave or to meet seasonal or short-term workload

conditions." (Id. at § V(19).)

     Nationwide appears to have received an insurance claim from Bodnar on August 19,

2010. (See Doc. 173-4, Aug. 19, 2010, at 65.)[4] On August 20, Nationwide claims handler

Richard Lambrecht added a claims note stating "Spoke with agent of record's secretary.

She believes they already reported this accident to the named insured's WC [i.e., Workers'

---

[4] Plaintiffs submitted this claim file as Exhibit 5 to their Answer to Defendants' Statement of Facts in Support of Defendants' Third Motion for Summary Judgment. Because Plaintiffs are the nonmoving party, the Court accepts their submission as a true and accurate copy for summary judgment purposes.

Compensation] carrier." (*Id.*, Aug. 20, 2010, at 64.) A subsequent entry from Lambrecht on August 23 reports a conversation with Bodnar's attorney's paralegal, who reportedly "did not know much about the ciurcumstances [*sic*] of the accident, other than the deceased was an employee of the NI [i.e., Bodnar] and was working on a jobsite on behalf of the NI when he was killed." (*Id.*, Aug. 23, 2010, at 63.) He further added that "[a]pparently the decedent was in his first year of employment with the NI, so there are no other tax and/or payroll documents confirming his status." (*Id.*) An entry that same day by one Mark Diseroad adds that if James Berry were indeed an employee, and if Bodnar maintained Workers' Compensation coverage, then Bodnar would have no tort exposure as Workers' Compensation would be the widow's sole remedy. (*Id.*) But Diseroad noted that this could be altered by other contractual agreements and requested that Lambrecht "determine . . . [Berry's] role in the job ie general contractor/sub contractor and determine if there are any written contracts between the parties that may contain defense and indemnity language." (*Id.*) Lambrecht added another entry on August 23, referring to Berry as "an employee of Bodnar Masonry" and relaying a report "that the WC carrier for Bodnar Masonry has paid out over $600,000.00 to date as a result of their accident." (*Id.*, Aug. 23, 2010, at 62.)

On August 24, 2010 Nationwide representative Joseph Bottger added a note to the claim file citing the above employee exclusion and referring to Berry as an "employee." (*See id.*, Aug. 24, 2010, at 61.) Bottger then provided several notes for Nationwide to further investigate, as follows:

7

Notes:

*Matter not in suit. The estate is represented. Loss occurred in Luzerne County.

*Find out whether there was a contract between the two PH pwned [sic] entities.

*Were there any subs on the job prior to the loss? If so, who dug the trench?

*Follow-up with the agent to confirm that the campground was not supposed to be an AI prior to the DOL.

*We need to confirm that the decedent does indeed meet the definition of an employee. How was he being paid? Obtain copies of his W2s or other pay documents. Did the PH maintain a file on him? Is WC paying death benefits to the decedent's estate?

*Who are the decedent's survivors, and notwithstanding liability or coverage, what is the full value of his claim?

*Send an UW notice regarding this loss. It looks like the PH is doing a lot more than masonry.

*Bodnarosa Motel & Campground Llc [sic]. Any other partners in the Llc?

*WC should be the sole remedy, but the estate's atty will likely try to get around this by proving that the decedent was no [sic] an employee, or that the PH has an individual exposure aside from his role as a masonry contractor.

*Schedule this for conference w/ leadership, UW and [Nationwide counsel] Cheryl Kovaly.

(*Id.* at 62.)

On August 25, 2010, another note was added, in which Lambrecht stated that he

spoke with Bodnar's wife and obtained, *inter alia*, the following information:

(2) Decedent had worked as an independent sub-contractor for [Bodnar's] masonry business for several months before the accident. However, in order to for [sic] him to secure a home mortgage, he needed a more formal proof of income, i.e. "on the books." After discussing matters with her husband, they decided that Berry would become a payroll employee of Bodnar Masonry a few weeks before the fatal accident. Mrs. Bodnar will fax me copies of his pay stubs leading up to the date of loss. She will also confirm the date of the first job Berry did sub-contract work for Bodnar Masonry;

(3) Mrs. Bodnar confirmed that Bodnar Masonry's workers compensation carrier, after some initial investigation, verified that Berry was an employee of Bodnar Masonry and paid full benefits to his widow . . . .

8

(*Id.*, Aug. 25, 2010, at 60.)

The next day's entry called Mrs. Bodnar's Workers' Compensation statements into

question:

> Received call from Estate's attorney, Mike Mey. His understanding is that the
> WC carrier has yet to make a determination re: employment and pay benefits.
> Furthermore, Mey has reason to believe (he was guarded with his words) that
> a "paper file" regarding the deceased's employment was "put together" after
> the accident and may not accurately reflect his status. When I asked how he
> intended to refute pay stubs from Bodnar Masonry to Mr. Berry that were
> issued before the accident, PC [i.e., Mey] simply indicated "there is more than
> meets the eye here."
>
> PC will send me a copy of the autopsy report and a list of volations
> [*sic*] resulting from the OSHA investigation. Mey insisted that when and if we
> can prove the deceased was a paid employee of Bodnar Masonry at the time
> of the accident, he'll advise his widow that her sole remedy is Workers [*sic*]
> Compensation. PC also provided me with the name and phone number of the
> WC rep handling the Berry claim . . . .

(*Id.*, Aug. 26, 2010, at 58.)

A note entered on September 1 indicated that the Workers' Compensation

representative "has requested employment documentation on several occasions from the

Bodnar's [*sic*] and their attorney, with no cooperation" and that the Berry Estate's attorney

"has specifically requested that WC benefits not be paid until such time as the widow looks

at the payroll documentation provided and agrees her late husband was an 'employee.'"

(*Id.*, Sep. 1, 2010, at 57.)

On September 17, Lambrecht noted receipt of "additional mortgage loan

applications" filed by the Berrys approximately three weeks before the accident, which list

9

James Berry's last two employers as "Northeast Aquastore since 2009, and Cheetah Chasis from 12/01/2003 to 12/17/2008." (Id., Sep. 17, 2010, at 54.) Lambrecht further notes that there "is no mention of Bodnar Masonry on this document, which appears to contradict the information given to me by Mrs. Bodnar shortly after this loss was reported by the agent," i.e., in which Mrs. Bodnar stated that Berry was made a Bodnar Masonry payroll employee to help him secure a home mortgage. (Id.)

On October 11, Lambrecht noted that Frank Kepner, the attorney representing Bodnar in the underlying tort suit, "confirms there was an extensive OSHA investigation resulting in a $8,000.00 (approximate) fine, which they are appealing." (Id., Oct. 11, 2010, at 52.)

On October 21, Kepner further agreed to send Lambrecht "additional documents today regarding the decedent's recent tax returns and 'payroll checks' that were issued by our NI. According to PC, the decedent never executed a W-4 and his widow refused to cash the three (3) checks issued to her late husband by Mrs. Bodnar." (Id., Oct. 21, 2010, at 52.) Nationwide received this information on October 25. Upon receipt, Lambrecht noted, *inter alia*:

4) Federal income tax returns filed jointly by the decedent and his widow in 2007, 2008, and 2009 do not relect [sic: perhaps "reflect"] any W-2's or 1099's from Bodnar Masonry;
5) It appears that the decedent's income ranged from $29,336.00 in 2007 to $49,839.00 in 2009, with a W-2 listing his empoyer [sic] as Northeast Aquastore in Phillipsburg, NJ;
6) There are two (2) payroll stubs and three (3) checks from the NI to James Berry in 2010, as follows:

10

> - Check stub for pay period 4/17/10 to 4/23/10, with net wages of $651.98
> - Check stub for pay period 4/24/10 to 4/30/10, with net wages of $538.99
> - Check # 4107 dated 4/30/10 for $651.98 payable to James Berry;
> - Check # 4118 dated 5/07/10 for $538.99 payable to James Berry;
> - Check # 4111 dated 5/01/10 for $1,500.00 payable to Danielle Bery [sic]
>
> Note that all of the checks are dated after the 4/29/10 accident date.

(Id., Oct. 25, 2010, at 51.)

In an entry on the same date, Lambrecht represents that he recently spoke with

Bodnar and Kepner and that "[i]n brief, Bodnar did not consider the decedent James Berry

an employee of Bodnar Masonry at the time of the accident." (Id., Oct. 25, 2010, at 50.) As

evidence of this Lambrecht states that Bodnar never hired Berry for any type of work before

April 2010; that Bodnar never issued Berry a W-2 or 1099 form, even though he did so for

his other employee-laborers; that "[b]oth men agreed that Berry's work at Bodnarosa would

be limited to 2-3 weeks" while Berry was "temporarily out of work, and needed some income

to 'hold him over' before starting a job with a local gas company;" and that "Berry agreed to

be paid cash under-the-table for his work at Bodnarosa, and understood that Bodnar would

send him a 1099 form at the end of the year to document his income." (Id.) Further,

> [r]egarding the check stubs and checks, Bodnar explained that his wife was simply trying to "make it right" for Berry's widow and called in his hours for those two weeks to the accountant along with their regular employees. The third check, payable to Danielle Berry in the amount of $1,500.00, was to help her pay for funeral expenses only. Bodnar believes that his wife and Danielle Berry discussed all of the checks before they were issued, but doesn't know if the wives fully understood the "cash under the table" arrangement he and Berry agreed to beforehand. Neither Bodnar nor his attorney recalls who

11

reported Berry's claim to his Workers [sic] Compensation carrier; [Bodnar's] attorney Kepner believes it was done at the request of PC Mike Mey for "record only" but has no documentation confirming same.

(Id.)

An important moment for Plaintiffs' bad-faith claim occurred in November 2010. (See, e.g., Pls.' Br. in Opp. to Def.'s Third Mot. for Summ. J., Doc. 172, at 24.) That is, on November 4, Lambrecht added a note that "claims leadership" had reached a consensus "that the deceased would meet the definition of a 'temporary worker.'" (Doc. 173-4, Nov. 4, 2010, at 49.) If the consensus were true, then, all else being equal, Bodnar would be entitled to coverage under the policy. Lambrecht further noted that claims legal counsel Kovaly "will do some legal research and get back to us with her findings & opinion" as to how "temporary worker" is defined under Pennsylvania law. (Id.) He added that, "[i]f the 'temporary worker definition is found to be ambiguous, we probably cannot rely on the employer's liability exclusion to bar coverage." (Id.)

Then, on November 8, 2010, with no explanation contained in the file log, Nationwide did what Plaintiffs call an "about-face." (See Doc. 172 at 24.) The claim log on that day begins with a statement that has been redacted for reasons of legal privilege. (See Doc. 173-4, Nov. 8, 2010, at 49; Def.'s Privilege Log, Doc. 173-4, at 2.) Immediately following the redaction, it reads: "Accordingly, there is a good faith argument to be made that this loss falls within the Employer Liability Exclusion to coverage. Thyerefore [sic], a declaratory judgment complaint is recommended in this matter." (Doc. 173-4, Nov. 8, 2010, at 49.) At

12

oral argument, Defendant's counsel stated that the apparent "about-face" occurred because of Kovaly's legal advice, but further stated that Defendant would not waive its privilege and disclose the contents of that advice. (Oral Argument Tr. at 56:13-57:13.)

On March 23, 2011 claims handler Lance Jamison noted that Bodnar's Workers' Compensation carrier "paid for a claim under Bodnar, but had not obtained necessary information from Bodnar to show that the claimant Barry [sic] was an employee or IC" and so it "denied the WC claim." (Doc. 173-4, Mar. 23, 2011, at 40.) A later entry confirms that Workers' Compensation insurance was in fact denied. (Id., Oct. 25, 2011, at 9.)

On April 6, 2011, Jamison added to the claims file a note from a person identified as "DC."[5] (See id., Apr. 6, 2011, at 32.) DC describes meeting with Bodnar and his attorney Frank Kepner the previous day as part of the underlying tort lawsuit. (Id.) His note describes the background of the case and adds the following information relevant to Berry's employment status:

- "Mr. Berry had worked with [Bodnar] for two weeks, primarily installing drainage fields and pipes. Mr. Bodnar utilized his heavy equipment but Mr. Berry also had his own tools." (Id.)

- "[Bodnar] did not pay Mr. Berry any benefits. In fact, he did not pay any of his employees benefits. All of them were treated exactly the same as Mr. Berry with the notable exception that they were all on his payroll" and Berry was not. (Id. at 33.)

---

[5] This appears to be the new defense counsel in the underlying lawsuit, George Saba. (See Oral Argument Tr. at 52:17-21.)

- "Every week, Mr. Bodnar sent his Accountant a listing of the employees and hours worked. The Accountant, J. Williams, would then provide Mr. Bodnar with a payroll for the week and deduct all taxes, etc. Mr. Bodnar would then issue a check to the employee for the net amount. In Mr. Berry's case, he was just giving him cash with no deductions. It should be noted that after Mr. Berry's death, Mrs. Bodnar added Mr. Berry to the payroll and issued his widow two checks. These checks did have the necessary withholdings for taxes." (*Id.*)

- "[Mr. Bodnar] tells me Mrs. Bodnar simply added Mr. Berry to the payroll so his widow could be paid for the owed time. She did not have any other motive." (*Id.*)

- "After the incident, [Bodnar] was cited by OSHO [*sic*] for failing to utilize trench boxes and having the dirt too close to the walls of the 4 foot trench. He was fined $8000 but OSHA agreed to reduce it to $7000. He continues to pay the fine in installments." (*Id.*)

DC further discussed the "Answer/New Matter recently filed by Bondorasa Masonry [*sic*]" in the tort suit. (*Id.*) He wrote that "[i]n the Answer, it is specifically admitted that Mr. Berry was an independent contractor at the time of this incident. Mr. Bodnar signed the verification." (*Id.*) He then opined:

> I am not sure why this was admitted but, for whatever reason, it will now be difficult for me to raise worker's comp as a potential defense. Frankly, at this juncture, I am not sure what Mr. Berry would have been considered but it does appear that a possible defense has been diluted, if not obviated.

(*Id.*)

14

On July 6, 2011, Jamison reported another conversation with DC, in which DC stated that certain admissions in discovery in the tort suit that denied that Berry was an employee create "a tough situation" for Nationwide. (*Id.*, Jul. 6, 2011, at 23-24.)

On September 7, 2011, Jamison again noted contradictory information, in that the "OSHA report shows that Berry is described as an 'employee,' would have been 'laid off' after the job was over. However, Bodnarosa answer, where Stephen Bodnar signed [*sic*], he notes Berry as an Ind Contractor." (*Id.*, Sep. 7, 2011, at 13.)

On October 4, 2011, Jamison wrote:

> Spoke with George Saba regarding liability and reserve on this file today. He noted that if we lose the Dec Action we are dead in the water on liability. He states that although not handling the Dec action, questionable if we are successful on that end. States that we have bad liability issues and the OSHA report seals our liability fate. He states that we might could argue w/ Mike Mey for a reduction % in lieu of settlement offer now . . . .

(*Id.*, Oct. 4, 2011, at 12.)

Though it had met with him before, Nationwide formally deposed Bodnar as part of the Luzerne County declaratory judgment action on March 1, 2012. (*See generally* Stephen Bodnar Dep., Mar. 1, 2012, Doc. 178-1.) Bodnar represented many times throughout the deposition that Berry was a temporary worker and not an employee and that, among other things, Berry brought his own tools to work, (*id.* at 78:9-24), that his agreement with Berry was for Berry to only work for a few weeks, (*id.* at 88:17-22), and that he did not pay Berry like a regular employee, (*id.* at 87:6-90:21).

15

As discussed above, Nationwide's next action was to discontinue its declaratory judgment action in February 2013 and pay Danielle Berry and the Estate the full proceeds of Bodnar's insurance policy, plus interest. (See, e.g., Oral Argument Tr. at 72:20-73:13.)

## III.    Procedural History

Defendant Nationwide Insurance Company filed its first Motion for Summary Judgment in the early stages of this case, on March 13, 2013. (See Def.'s First Mot. for Summ. J., Doc. 22.) The Court denied that Motion on May 16, 2013, on the grounds that Plaintiffs' claims of breach of contract and bad faith against the insurance carrier were not precluded as a matter of law and that a determination of the merits of such claims must be deferred at least until the conclusion of discovery. (See Mem. Op., May 16, 2013, Doc. 33, at 29.)

Defendant then filed an Amended ("Second") Motion for Summary Judgment on June 30, 2014. (See Def.'s Am. Mot. for Summ. J., Doc. 114.) This Motion was filed before the completion of discovery, but argued that the facts that had already been discovered conclusively established that Plaintiffs' bad faith claims could not succeed as a matter of law, such that "[w]ere discovery to proceed for a millennium, the Plaintiff could never unring the bell which has tolled in the form of documentary proof that Nationwide was subjectively and objectively aware of a host of conflicting facts concerning the decedent's employment which created a bona fide coverage question." (Def.'s Br. in Supp. of Am. Mot. for Summ. J., Doc. 121, at 22.)

Discovery proceeded for several additional months. The Court had not addressed the merits of Defendant's Second Motion for Summary Judgment by the time discovery apparently closed. [6] Accordingly, on January 13, 2015, Defendant filed its Third Motion for Summary Judgment, which argued that under a traditional application of the summary judgment standard, this case presented no triable disputes of fact to warrant submission to a jury. (*See* Def.'s Third Mot. for Summ. J., Doc. 160, at ¶¶ 6-10.)

The Court heard oral argument on the two pending Motions for Summary Judgment on February 18, 2015. At the beginning of oral argument, the Court informed counsel that it did not view the two motions as separate, but rather that it understood the third motion to expand on the second one based on additional discovery. (*See* Oral Argument Tr. at 2:4-15.) Counsel generally agreed. (*See id.* at 2:17-4:25.) Indeed, counsel for the moving party

---

[6] Discovery in this case was referred to Magistrate Judge Blewitt and, upon Judge Blewitt's retirement, to Magistrate Judge Carlson. On September 22, 2014, Judge Blewitt issued an Order extending discovery deadlines *nunc pro tunc* only for certain limited purposes and for a period of thirty days. (*See* Order, Sep. 22, 2014, Doc. 151, at 4.) Plaintiffs then raised certain issues with Judge Blewitt's Order in the form of one letter and two motions that sought discovery on other issues not permitted by the Order. (*See* Docs. 152, 155, 156.) Plaintiffs' motions were never resolved by the time of Judge Blewitt's retirement. Magistrate Judge Carlson thereafter dismissed Document 156 (a Motion for Extension of Discovery Deadlines) as moot. (*See* Order, Jan. 20, 2015, Doc. 164, at 1.) In so doing, Judge Carlson also noted that certain discovery issues may still exist and therefore allowed the parties additional time to address them. (*Id.*) Plaintiffs responded by asserting several discovery issues, none of which were permitted by Judge Blewitt's September 22 Order. (*See* Michael Mey Letter, Jan. 22, 2015, Doc. 166, at 1-2.) Defendant countered that no discovery disputes exist and that all discovery was complete. (*See* Bryon Kaster Letter, Jan. 22, 2015, Doc. 167, at 1.) Judge Carlson did not resolve Plaintiffs' asserted issues, but instead stayed discovery until the resolution of Defendant's Second and Third Motions for Summary Judgment. (*See* Order, Jan. 26, 2015, Doc. 171, at 5.)

Without deciding the issue, the Court presently views Judge Blewitt's September 22, 2014 Order—which was never vacated or altered—as the law of the case and therefore does not understand how additional discovery could be allowed. However, even if more discovery is permissible, Judge Carlson's January 26, 2015 Order—which was also never vacated or altered—stayed it. Therefore, for purposes of resolving the issues raised in the Motions for Summary Judgment, the Court considers discovery closed.

stated that "the second [motion] was filed to try to get judgment to avoid the discovery that has already taken place, so the second one was really looking at a period of time to avoid that additional discovery." (Id. at 4:2-6.)

Because the additional discovery which Defendant sought to avoid occurred, the Court will treat the Second Motion for Summary Judgment as superseded by and subsumed within the Third Motion for Summary Judgment. Therefore, the Court will treat the Third Motion as the operative Motion, unless the Second one raises issues not addressed in the Third which have not been rendered moot by the close of discovery.

## IV. Standard of Review

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of

18

the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S.

at 248.

> A party asserting that a fact cannot be or is genuinely disputed must support
> the assertion by citing to particular parts of materials in the record . . . or
> showing that the materials cited do not establish the absence or presence of
> a genuine dispute, or that an adverse party cannot produce admissible
> evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted,

"[t]he court need consider only the cited materials, but it may consider other materials in the

record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to

the non-moving party, and where the non-moving party's evidence contradicts the movant's,

then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,*

974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party

only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127

S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the

summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical
> doubt as to the material facts. Where the record taken as a whole could not
> lead a rational trier of fact to find for the nonmoving party, there is no genuine
> issue for trial. The mere existence of some alleged factual dispute between
> the parties will not defeat an otherwise properly supported motion for
> summary judgment; the requirement is that there be no *genuine* issue of
> *material* fact. When opposing parties tell two different stories, one of which is
> blatantly contradicted by the record, so that no reasonable jury could believe
> it, a court should not adopt that version of the facts for purposes of ruling on a
> motion for summary judgment.

19

*Id.* (internal quotations, citations, and alterations omitted).

## V. **Analysis**

### a. **Breach of Contract**

"To successfully maintain a cause of action for breach of contract the plaintiff must

establish: (1) the existence of a contract, including its essential terms, (2) a breach of a duty

imposed by the contract, and (3) resultant damages." *Hart v. Arnold*, 884 A.2d 316, 332 (Pa.

Super. Ct. 2005). In the insurance context, the Pennsylvania Supreme Court has "long

recognized that: 'the utmost fair dealing should characterize the transactions between an

insurance company and the insured.'" *Dercoli v. Pennsylvania Nat'l Mut. Ins. Co.*, 554 A.2d

906, 909 (Pa. 1989) (quoting *Fedas v. Ins. Co. of Pa.*, 151 A.2d 285, 286 (1930)).

> Moreover, the insurance company has a duty to deal with its insured "on a fair
> and frank basis, and at all times, to act in good faith." *Id.*; *Hollock v. Erie Ins.
> Exchange*, 842 A.2d 409, 416 (Pa. Super. 2004) (holding that an insurer has
> a duty to act with the utmost good faith towards its insured). The duty of good
> faith originates from the insurer's status as a fiduciary for its insured under the
> insurance contract, which gives the insurer the right, *inter alia*, to handle and
> process claims. *See, e.g., Ridgeway v. U.S. Life Credit Life Ins. Co.*, 793 A.2d
> 972, 977 (Pa. Super. 2002). The law implies this duty of good faith into the
> insurance contract, and thus the "breach of such an obligation constitutes a
> breach of the insurance contract. . . ." *Gray v. Nationwide Mut. Ins. Co.*, 422
> Pa. 500, 508, 223 A.2d 8, 11 (1966); *The Birth Ctr. v. The St. Paul Cos.*, 567
> Pa. 386, 400, 787 A.2d 376, 385 (2001) (holding that the breach of the
> obligation to act in good faith "constitutes a breach of the insurance contract").

*Berg v. Nationwide Mut. Ins. Co.*, 44 A.3d 1164, 1170 (Pa. Super. Ct. 2012).

Here, the same facts that give rise to the breach of contract apply equally to the bad

faith claim. Thus, the Court will treat the two claims simultaneously in section V(c), *infra*.

### b. Bad Faith

Aside from the above contractual duties, the Pennsylvania legislature has created a

statutory remedy for an insurer's bad faith conduct, which reads as follows:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
>> (2) Award punitive damages against the insurer.
>> (3) Assess court costs and attorney fees against the insurer.

42 Pa. Cons. Stat. Ann. § 8371.

"The standard for bad faith claims under § 8371 is set forth in *Terletsky v. Prudential*

*Property & Cas. Ins. Co.*, 437 Pa. Super. 108, 649 A.2d 680, 688 (1994), *appeal denied*,

540 Pa. 641, 659 A.2d 560 (1995)." *Klinger v. State Farm Mut. Auto. Ins. Co.*, 115 F.3d 230,

233 (3d Cir. 1997). *Terletsky* defined the term "bad faith" as follows:

> In the insurance context, the term bad faith has acquired a particular meaning:
>> *Insurance*. "Bad faith" on part of insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

*Terletsky*, 649 A.2d at 688 (quoting Black's Law Dictionary 139 (6th ed. 1990)). "[T]o

recover under a claim of bad faith, the plaintiff must show that the defendant did not have a

reasonable basis for denying benefits under the policy and that defendant knew or

21

recklessly disregarded its lack of reasonable basis in denying the claim." Id. "In a bad faith case, summary judgment is appropriate when there is no clear and convincing evidence that the insurer's conduct was unreasonable and that it knew or recklessly disregarded its lack of a reasonable basis in denying the claim." Bostick v. ITT Hartford Group, Inc., 56 F. Supp. 2d 580, 587 (E.D. Pa. 1999).

Bad faith refusal to settle a case is the type of conduct covered by section 8371. Birth Center v. St. Paul Cos., Inc., 787 A.2d 376, 389 (Pa. 2001). "[W]hen an insurer breaches its insurance contract by a bad faith refusal to settle a case, it is appropriate to require it to pay other damages that it knew or should have known the insured would incur because of the bad faith conduct." Id. Moreover, "using litigation in a bad faith effort to evade a duty owed under a policy would be actionable under Section 8371." W.V. Realty, Inc. v. N. Ins. Co., 334 F.3d 306, 313 (3d Cir. 2003).

In this Court's Opinion on the instant Defendant's First Motion for Summary Judgment, it found the law unsettled on whether Plaintiffs are legally permitted to assert a claim for bad faith when the Defendant paid the full proceeds of Bodnar's insurance policy in the absence of any court order to do so. (See Doc. 33 at 21-29.) But, given the state of Pennsylvania law and the decisions of other district courts in this Circuit, the Court nonetheless held that "Nationwide may not avoid further inquiry into its conduct in connection with its handling of the claims [at issue] by asserting its ultimate payment of the policy limits to Danielle Berry as a complete defense entitling it to summary judgment as a

22

matter of law." (*Id.* at 27.) It held that, while "an insurer's delay in the settlement of a claim, standing alone" need not present a cause of action for breach of contract or bad faith, a "delay in payment of a third party claim, if of inordinate and unreasonable length, effectively becomes a denial of the claim as assuredly as if the denial was swiftly and unequivocally communicated to the insured." (*Id.* at 27-28.) Thus, if Nationwide did engage in bad faith conduct under the circumstances, even if it ultimately paid the full policy limits, then it could still be held liable in this case. (*See id.* at 28.)

However, before the Court turns to the question of whether a material dispute of fact exists regarding Defendant's bad faith, there remains a threshold issue of just what information is relevant to Defendant's alleged bad faith. Throughout this litigation, Nationwide has taken the position that the Court may consider information that was "objectively available" to justify Nationwide's claims handling and defeat a bad faith claim, even if no evidence exists that Nationwide in fact relied on that information. (*See, e.g.,* Def.'s Br. in Supp. of Am. Mot. for Summ. J., Doc. 121, at 16; Def.'s Mot. for Recons., Doc. 62, at ¶ 6.) According to the Defendant, federal district courts in Pennsylvania have repeatedly held that if any reasonable basis exists for delaying resolution of a claim, "even if it is clear that the insurer did not rely on that reason, there cannot, as a matter of law, be bad faith." (*See* Def.'s Br. in Supp. of Mot. for Recons., Doc. 70, at 7-8 (quoting *Williams v. Hartford Cas. Ins. Co.*, 83 F. Supp. 2d 567, 574 (E.D. Pa. 2000)).)

The Court previously responded to this argument as follows:

In the *Williams* case, cited by the Defendant above, the District Court for the Eastern District of Pennsylvania held that the first prong of the test cited in *Klinger* and *Terletsky* "is an objective one: that is if there is a reasonable basis for delaying resolution of a claim, even if it is clear that the insurer did not rely on that reason, there cannot, as a matter of law be bad faith." *Williams*, 83 F. Supp. 2d at 574.

It is somewhat unclear what precedential value *Williams* has. Though it was affirmed by the Third Circuit, that affirmance was without opinion, thus shedding little light on the Circuit's reasoning. *See Williams v. Hartford Cas. Ins. Co.*, 261 F.3d 495 (Table) (3d Cir. 2001). Moreover, the cases on which *Williams* relies for the cited proposition are not necessarily directly on point. *See Jung v. Nationwide Mut. Fire Ins. Co.*, 949 F. Supp. 353, 359 (E.D. Pa. 1997) (holding that, when insurer reasonably, albeit incorrectly, believed that insured relied on misrepresentations in its insurance application, a denial *on that basis* was not in bad faith); *Hyde Athletic Indus., Inc. v. Continental Cas. Co.*, 969 F. Supp. 289, 307 (E.D Pa. 1997) (holding that "an insurer does not act in bad faith by investigating and litigating legitimate issues of coverage" that it knew about).

Nonetheless, the weight of opinion among the District Courts of Pennsylvania supports the proposition in *Williams*. *See Serino v. Prudential Ins. Co. of Am.*, 706 F. Supp. 2d 584, 592 (M.D. Pa. 2009); *Oehlmann v. Metro. Life Ins. Co.*, 644 F. Supp. 521, 528 (M.D. Pa. 2007); *Livornese v. Med. Protective Co.*, 219 F. Supp. 2d 645, 648 (E.D. Pa. 2002), *rev'd on other grounds*, 136 Fed. App'x 473 (3d Cir. 2005); *Lites v. Trumbull Ins. Co.*, 2013 WL 5777156, at *5 (E.D. Pa. 2013); *MP III Holdings, Inc. v. Hartford Cas. Ins. Co.*, 2011 WL 2604736, at *16 (E.D. Pa. 2011); *Ski Shawnee, Inc. v. Commonwealth Ins. Co.*, 2010 WL 2696782, at *5 (M.D. Pa. 2010); *Robbins v. Metro. Life Ins. Co. of Conn.*, 2008 WL 5412087, at *7 (E.D. Pa. 2008); *Wedemeyer v. U.S. Life Ins. Co. in City of New York*, 2007 WL 710290, at *9 (E.D. Pa. 2007); *Meyer v. CUNA Mut. Group*, 2007 WL 2907276, at *12 (W.D. Pa. 2007); *Bell v. Allstate Ins. Co.*, 2005 WL 1353527, at *5 (E.D. Pa. 2005); *Burrell v. United Healthcare Ins. Co.*, 2001 WL 873221, at *3 (E.D. Pa. 2001) . . . .

(Mem. Op. Partially Granting Recons., July 11, 2014, Doc. 123, at 5-7.) However, the Court

also noted the case *Shannon v. New York Central Mutual Insurance Co.*, 2013 WL

6119204, at *3 (M.D. Pa. 2013), which held that "[g]iven the remedial purpose underpinning

24

the Bad Faith Statute, we are not persuaded that permitting an insurer to evade its statutory obligation due to some fortuitous fact to which it was oblivious is consistent with the legislature's intent." (*See id.* at 7.)

For purposes of resolving the instant Motions, however, the Court need not take a position in this intra-Circuit split. As discussed below, the Court finds that, even when we consider only the information as to which the record shows that Defendant was subjectively aware during its claims-handling process, no evidence exists to indicate that Defendant acted in bad faith.

### c. Actions Relevant to Breach of Contract or Bad Faith

Plaintiffs premise much of their arguments on the belief that Nationwide began and conducted its investigation "with a predisposition toward denial." (*See* Doc. 172 at 22.) Thus, Plaintiffs argue:

> In fact Nationwide's very first few claims notes show it's only view toward Berry was as an "employee." Nationwide has admitted it had no documentary evidence from its insured to support such a conclusion. It has admitted that it never had the workers [*sic*] compensation file it now seeks to rely upon. It took no statements from any witnesses. It gathered no documents itself. When it received documents disproving its conclusion that Berry was an employee it simply ignored them.

(*Id.*)

The Court cannot agree with this interpretation of the claim file. While initial entries do refer to Berry as an "employee," there is no suggestion in the record that this was meant to be a binding characterization, instead of a mere term of convenience. The claims file is

replete with misspellings, grammatical errors, and loose language. It is not written in the careful manner in which a lawyer preparing for litigation might write. But loose language is not itself a sign of bad faith, unless it is coupled with some other kind of dishonesty motivated by ill motives. This could be the case if Nationwide arbitrarily decided to call Berry an "employee" and refused to accept contrary evidence. However, the claim file does not indicate that any such course of conduct occurred. It demonstrates that Nationwide continued to investigate the claim, to consult with attorneys, and to attempt determine whether Berry was in fact an employee or a temporary worker, as evidenced in the entries of November 2010 in which, notwithstanding its initial characterizations, Berry's status is still a subject of uncertainty.

Moreover, Plaintiffs' insinuation that Nationwide merely attempted to fit Berry into the "employee" category without adequate investigation bespeaks a distortion of the insurer-insured relationship. As in all insurance cases, Nationwide issued Bodnar a policy at a certain price which covered certain occurrences and excluded others. If Berry's death was in fact an excluded occurrence, then for Nationwide to pay it would give Bodnar a benefit for which he never contracted. It is therefore Nationwide's duty to discover whether Berry's death was in fact an excluded occurrence. The fact that Berry on his face appeared to be an employee—as evidenced by such facts as that it appeared to Nationwide that a Workers' Compensation claim was filed—meant that Nationwide was perfectly within its rights to

investigate his status, and that a fortiori, such investigation was not in bad faith without some extra reason to deem it so.

Nor can the Court see any reason to conclude that Nationwide's decisions to not interview other witnesses or gather other documents creates a triable issue of fact as to bad faith or breach of contract. For one thing, the information available to Nationwide through the claims record indicates that Berry's relationship with Bodnar was "off the books," which makes it likely that no other documents would exist to shed light on his employment status. It is further unclear what value additional witnesses would add to settling the employment question.[7] Berry's relationship with Bodnar was based on an understanding between the two of them, so additional witnesses beyond Berry and Bodnar would be unlikely to provide further information. Thus, the primary issue of Berry's employment was not the factual one of uncovering additional evidence—because the record reflects that no other evidence existed that could have been uncovered—but rather a legal one: that is, given the undocumented understanding between Berry and Bodnar, and the course of action that each of them took during their working relationship, whether Berry was an employee This legal question by its very nature could not be answered by additional factual investigation; instead, it would best be answered by the courts. In filing a declaratory judgment action,

---

[7] Indeed, though Plaintiffs assert that Nationwide did an incomplete factual investigation, Plaintiffs point to no witnesses or documents that Nationwide should have but did not consider.

Nationwide requested just such a judicial answer. This Court cannot see anything improper

in that.[8]

Plaintiffs nonetheless argue that "truly unreasonable" activity took place on

November 8, 2010, when Nationwide decided that it had a reasonable basis to argue that

Berry was an employee. (Doc. 172 at 24.) Plaintiffs write:

> [A]fter taking Bodnar's statement and confirming that it needed no further information from either Bodnar or the Berry Estate, having all of the information necessary to make a decision[,] Nationwide's claims committee came to a consensus that Berry met the definition of "temporary worker." What happens next is truly unreasonable: without further information, or request for any further investigation, Nationwide's claims committee does an about-face on November 8, 2010 and now decides there is a "reasonable basis to argue that Barry [sic] was an employee" and a declaratory judgment action should be filed.

(Id. (internal citations omitted).) Nationwide argues that it only made this decision on advice

of its counsel, Cheryl Kovaly. Indeed, the claims file reflects certain discussions with

counsel at this time. (See p. 12, supra.) However, those discussions are redacted, which

means that the Court cannot judge whether they by themselves provided a reasonable

basis for Nationwide to conclude that Berry was in fact an employee.

While being able to read Kovaly's advice would certainly clarify this matter, the Court

cannot find that the redaction affects its summary judgment decision. For one reason,

---

[8] Even if this were not true, and even if Nationwide should have done a deeper factual investigation (a conclusion this Court does not necessarily accept), Plaintiffs' claims still could not survive summary judgment. At most, this would show that Nationwide acted with negligence or bad judgment. See Terletsky, 649 A.2d at 688. In order to establish bad faith, Plaintiffs would need to further show that these omissions were made out of self-interest or ill will. Id. But no such purpose can be inferred from the summary judgment record, for the reasons discussed above.

whatever Kovaly's advice was, it only led to a determination to file a declaratory judgment action, not to deny coverage. As discussed above, (see pp. 27-28, supra), a decision to seek a judicial determination on whether coverage existed is not indicative of bad faith or breach of contract, especially when, as here, the implications of the background facts at issue are legally ambiguous.

Moreover, it is significant that the Plaintiff never moved to compel disclosure of Kovaly's advice and never argued that summary judgment should be denied because the advice was not disclosed. Plaintiff only argued that Nationwide's "about-face" was unexplained by the claim file. But such an argument fails on its merits, because, as discussed passim, there was contradictory information in the claim file, of which Nationwide was subjectively aware, to suggest in the alternative that Berry was Bodnar's employee and that he was a temporary worker. As to the former, there was evidence that an OSHA action and a Workers' Compensation claim had been filed and that Berry had been placed on Bodnar's payroll, while, as to the latter, there were Bodnar's strong statements to Nationwide representatives about his professional relationship with Berry. Given the ample amount of conflicting information existing in this case, it cannot be bad faith or a breach of contract for Nationwide to equivocate between two defensible positions. Thus, even an unexplained change of mind cannot advance Plaintiffs' claims in this case. Even if we were

to assume that the "about-face" was entirely unexplained and ignore the fact that Nationwide actually did seek legal advice, no bad faith or breach of contract would follow.[9]

The Court is aware that disclosure of Kovaly's advice could theoretically alter its analysis if, for instance, the advice itself contained evidence of bad faith or if Kovaly advised Nationwide to act in a more generous way toward Bodnar than it actually did. This possibility, however, only rises to the level of a "metaphysical doubt" about the background facts that is insufficient to defeat summary judgment under *Scott v. Harris*, 550 U.S. at 380. Suffice it to say that there is nothing in *the record available to the Court* that suggests bad faith or breach of contract. Therefore, when we only look at the available summary judgment record, the Court concludes that Defendant has shown "the absence of a genuine issue as to any material fact," *Celotex*, 477 U.S. at 323, and that it is now the Plaintiff's burden to "offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact," *Lujan*, 497 U.S. at 888. Plaintiff's only effort to do so has been to argue that the record does not explain Nationwide's "about-face"—an argument the Court already disposed of above. Because Plaintiff never even raised the possibility that Kovaly's advice itself could contain evidence of bad faith, the Court is not required to consider that possibility on summary judgment.

All of Plaintiffs' other arguments for breach of contract or bad faith fail as well.

---

[9] In making this ruling without knowing the contents of Kovaly's legal advice, the Court should not be interpreted as shifting from a subjective to an objective review of the claims handling. Nationwide was subjectively aware of all the background facts contained in its claims record. Thus, the conclusions it reached must be assumed to be based on those facts as to which it is subjectively aware.

First, Plaintiffs attack Nationwide's decision to not define the term "employee" except by stating that it includes a leased worker and does not include a temporary worker. (*See* Doc. 172 at 3; *see also* p. 6, *supra* (citing "employee" definition).) As Plaintiffs note, Nationwide's Rule 30(b)(6) designee, Joseph Bottger, testified that "Nationwide doesn't have its own definition of what an employee is. We rely on the case law in the state and we apply that to the policy as best we can." (Doc. 172 at 3 (citing Joseph Bottger Dep., Doc. 173-1, at 137:12-18).)

This is irrelevant to either of Plaintiffs' claims. There is no evidence of record that Nationwide's insurance policy used a different definition of "employee" at the time that Bodnar obtained it. Rather, Bodnar bought the policy with this language in it. Nationwide, then, cannot be found in bad faith by operating under language to which Bodnar assented when he bought the policy. Moreover, in the absence of an explicit definition, there is nothing wrong with defining a term according to case law, as, indeed, this is the procedure that would be followed to determine the meaning of any undefined term. Therefore, Nationwide cannot be considered in bad faith simply because it sought a determination of its contractual language under Pennsylvania law. And, as already discussed above, the procedure that it followed—investigating the claim and then filing a declaratory judgment action to resolve the remaining legal ambiguities—is a proper way of determining this.

Second, Plaintiffs argue that Nationwide acted in bad faith by disregarding Bodnar's statements on October 25, 2010 that Bodnar believed Berry to be an employee. (*Id.* at 4.)

The Court cannot agree. While Nationwide would have been within its rights to rely on Bodnar's statements to grant coverage, those same statements were contradicted by other facts of record, such as the OSHA investigation, Workers' Compensation claims, and Berry's status on Bodnar's payroll, all of which suggest that Berry was excluded from coverage. Thus, evidence existed which pointed in both directions. It is not bad faith for Nationwide to come down on one side of this evidentiary split when both sides are defensible. And even less is it bad faith for Nationwide to disregard Bodnar's statements, when evidence supporting the other side is available, and when Bodnar himself is a clearly interested party, who, as a layman, is unable to opine on the legal meaning of an employee.

In this same vein, Plaintiffs note that "Bodnar had filed a verified answer to the action filed against the Campground corporate entity, Bodnarosa, LLC in which he swore to the Court that Berry was an independent contractor." (*Id.* (citing Doc. 173-4, at 28-29).) While this is true, the person[10] reporting this to Nationwide went on to add, "As you are aware we were neither consulted or involved in the preparation of the same. . . . I am not sure why this was admitted . . . ." (Doc. 173-4, Jun. 3, 2011, at 28.) Indeed, Nationwide itself never admitted that Berry was a non-employee, and it is not bound by Bodnar's representations to the contrary. Its duty to fairly evaluate the claim requires it to rely on all the available evidence, and not to simply accept Bodnar's representations about his own claim.

---

[10] (*See supra* note 5.)

Third, Plaintiffs argue that Nationwide did not conduct a reasonable investigation because it did not seek answers to all of the questions that Bottger laid out in his August 24, 2010 claims note, which is quoted in this Opinion at pages 7-8, *supra*. (*See* Doc. 172 at 15; Oral Argument Tr. at 52:14-21.) However, Bottger's claims note was one of the first entries in Bodnar's file, added just days after Nationwide received the claim. When read in the context of the whole file, Bottger's note is clearly a first impression containing educated guesses as to what information will be necessary to know as the case develops. It would be unreasonable to require Nationwide to find answers to all of these questions if, as occurred here, other information arises that calls Berry's employment status into question. Not finding answers to Bottger's questions would only be relevant if Nationwide did nothing else to investigate the claim. But, as discussed repeatedly above, Nationwide did adequately investigate the claim and thereby came upon information that provided an independent justification to file its declaratory judgment action.

Finally and somewhat unrelatedly, Plaintiffs complain that "Nationwide allowed and supervised a defense in the third party action which was adverse to Bodnar's interests." (Doc. 172 at 16.) Plaintiffs write:

> Perhaps the most egregious breach by Nationwide, once suit had been filed against Bodnar, was to permit assigned defense counsel to pursue a Workers' Compensation Defense when it knew Bodnar had already filed a verified answer on behalf of the co-defendant "Bodnarossa [*sic*] Campground" in which Berry is described as an independent contractor. This betrayal, bad in and of itself, was made worse still, since Nationwide knew Bodnar's comp carrier had already denied coverage and that the pursuit of a workers comp defense was in Nationwide's best interest, and against Bodnar's interest,

since this supported Nationwide's claim for relief to deny Bodnar coverage in the declaratory judgment action. Clearly a breach of Nationwide's ". . . duty to act with the utmost good faith towards its insured." *Hollock v. Erie Ins. Exchange*, 2004 PA Super 13, 842 A.2d 409, 416 (Pa. Super. 2004). Defense counsel's actions were supervised by Bottger, who knew that there was no reasonable basis to claim immunity under the Workers' Compensation Act as a defense [Exhibit 1, Bottger, designee, page 144:5], but also knew that such a defense was inline [*sic*] directly with the position Nationwide had taken in the declaratory judgment action. [Exhibit 1, Bottger, designee, page 230:2].

(*Id.*)

The Court cannot agree with this analysis. First, the cited portion of Bottger's

deposition testimony does not say that he "knew that there was no reasonable basis to

claim immunity under the Workers' Compensation Act as a defense." The cited portion

reads as follows:

Q. Is it Nationwide's position that a decision on the declaratory judgment action that says there is no coverage on the CGL [commercial general liability policy] that that automatically conveys immunity to Stephen Bodnar?

A. I don't believe it automatically conveys, no. We are only asking the Court to evaluate our coverage position. We cannot enforce what they do with Workers' Comp.

(Joseph Bottger Dep., Nov. 19, 2014, Doc. 173-1, at 144:1-8.) The Court believes it is

obvious that Bottger's only point is that the Luzerne County Court of Common Pleas'

determination of Berry's employment status is not binding on Bodnar's Workers'

Compensation carrier. It is illegitimate to infer from this that Bottger believed a Workers'

Compensation defense in the underlying tort action against Danielle Berry was meritless.

Indeed, insofar as Nationwide believed that Berry was actually an employee, a Workers'

34

Compensation defense would be an appropriate means of defending its insured.[11] If such a defense were successful, then it could defeat the tort claim. This would certainly be in Nationwide's interest, as it would not have to pay a claim. But it would just as certainly be in Bodnar's interest, as it would defeat any potential liability that he might have. The only one who could lose from this defense is Berry, insofar as she could be precluded from recovery in court but still be denied by the Workers' Compensation carrier. This is of no moment to the instant action, however, because Berry was not Nationwide's insured; only Bodnar was, and therefore Nationwide only owed duties to him.

### d. Summary

It is easy to focus on the details of Nationwide's claims handling. But we must keep in mind the larger picture. Nationwide received a claim that required it to determine the working relationship of two men who had only worked together for a few weeks before one's untimely death, kept their dealings "under the table," and reduced nothing to writing. The claims file reflects information that indicates that Berry variously could have been an employee, a temporary worker, or independent contractor. Nonetheless, Nationwide still

---

[11] This is complicated by the fact that, as discussed above, Bodnarosa admitted that Berry was an independent contractor in the underlying action. To admit this and then simultaneously pursue a Workers' Compensation defense may evince mistake or confusion on counsel's part, but it does not amount to bad faith or breach of contract. Moreover, the Court does not see how asserting the two contradictory positions could hurt Bodnar at all. If the Workers' Compensation defense contradicted a judicial admission, then this would only mean that Bodnar would be estopped from asserting that defense. It would not prejudice him in any other way aside from limiting his available defenses. And indeed, given that the Plaintiffs now object to the Workers' Compensation defense in this bad-faith action (though Bodnar did not similarly object at the time it was raised), the Court can only assume that if Bodnar would have been estopped from raising it, this would have been in accordance with his own subjective preferences, as demonstrated by the fact that he attacks Nationwide's allowing the defense now.

35

paid for Bodnar's defense in the underlying lawsuit. Faced with ambiguous facts, it also submitted the case separately to court for a declaration of Berry's legal status. Then, before such a declaration was ever issued, Nationwide discontinued its action and paid Bodnar's designee the full limits of his insurance policy.

The Court is willing to assume, for summary judgment purposes, that the weight of the evidence in the claims file suggested that Berry was a temporary worker and that Bodnar was owed coverage. It is willing to assume, for the same purposes, that the claims handlers made judgment calls with which a third-party observer could defensibly disagree. But it cannot agree that Nationwide's documented actions were unreasonable, given the facts it knew at the time, sufficient to sustain a bad faith action or an action for breach of contract. Despite Plaintiffs' repeated invocations of the Golden Rule, (see, e.g., Oral Argument Tr. at 48:11-14), the record does not suggest that Nationwide gave Bodnar any other treatment than that which he was owed as a policyholder. Its duty was to pay claims made against Bodnar only if coverage were owed under the terms of his policy. Nationwide investigated the issue, determined that it did not owe him coverage, and then ultimately decided to pay the policy limits to James Berry's Estate anyway. Plaintiffs may not like how the claim was handled, but it cannot be said that Nationwide breached any duty under these facts.

36

## VI.  Conclusion

For the foregoing reasons, Defendants' Motions for Summary Judgment (Docs. 114;

160) are **GRANTED**. A separate Order follows.

Robert D. Mariani
United States District Judge